## COUNTIES OF WASHINGTON, KENT, AND NEWPORT, DURING THE SPRING CIRCUIT, 1871.

PRESENT :

Hon. GEORGE A. BRAYTON, CHIEF JUSTICE.
Hon. THOMAS DURFEE, } JUSTICES.
Hon. ELISHA R. POTTER, }

## WASHINGTON COUNTY, FEBRUARY TERM, 1871.

### ELISHA R. POTTER *vs.* JOHN THOMPSON.

S. H. borrowed of H. certain railroad bonds, giving in pledge, as collateral security for the return thereof, two notes and an acceptance made by himself, and indorsed by one McD. and by T. the defendant, as accommodation indorsers. H. demanded the bonds of the agent of S. H. on the day on which they were by agreement returnable, tendering the securities in exchange for them, and after failure on the part of S. H. to return them, sold said securities at public auction, at Providence, pursuant to a notice published in a Providence newspaper. They had all fallen due before the notice of sale was given. The plaintiff purchased them at said sale and brought suit against the defendant T. as indorser thereof. *Held*, that the said notes and acceptance having matured, H., the pledgee, had a right to sell them at auction for his reimbursement.

*Semble*, that a court of equity would not sanction the sale of such securities for the benefit of the pledgee before they had matured, but would permit it after they had matured and payment thereof had been refused.

*Held, further*, that the sale was not invalid for want of personal notice to the pledgor, it appearing, that in the absence of the pledgor (the said S. H.) in Europe, notice of the

sale was given at his place of business, in New York, to one McD., who had been appointed his agent during his absence, with full power to do all things that the said S. H. might do if personally present — the notice given, in the absence of the principal, to an agent having such unlimited powers, being of the same effect as if given to the principal.

*Held, further,* that the sale was not invalid because made in Providence rather than in New York, inasmuch as the contract of hypothecation purported to be a Rhode Island contract, and it did not appear that the agent of the defendant, or the defendant himself who saw the notice of sale, objected to the place of sale previously thereto, when, if it was an improper one, the objection should have been made.

*Held, further,* that the sale was not invalid because made after the defendant had offered to redeem, such offer not being accompanied by a tender of the money to pay for the bonds, or of the bonds themselves and the money to pay for their depreciation.

*Held, further,* that the pledgee of such securities, selling for the default of the pledgor, sold to the plaintiff all the right or interest which the pledgor could empower him to sell at the time the pledge was given, although the sale was made after the maturity thereof.

ASSUMPSIT against the defendant as accommodation indorser of two promissory notes of one Samuel Hallett for $3,000 and $2,000 respectively; and of a draft of Seymour, Moore & Co. for $10,000. A jury trial having been waived the case was heard by the court both on facts and law, when it appeared that the notes and acceptance came to the hands of the plaintiff under the following circumstances: —

On the 26th of December, 1856, Samuel Hallett, of New York, borrowed of Rowland G. Hazard certain railroad bonds, giving in pledge, as collateral security for the return of the bonds, the notes and acceptances declared on, upon the following written agreement:

Borrowed and received of R. G. Hazard this 26th day of December, 1856, at Peacedale, Rhode Island, five first mortgage bonds of the La Crosse and Milwaukee Railroad Company, dated in Milwaukee July 1st, 1854, and payable in twenty years after date, each for one thousand dollars, with interest at eight per cent. per annum, payable semi-annually 1st of November and 1st of May; also twenty bonds of the Milwaukee and Mississippi Railroad Company, dated April 1st, 1854, and payable April 1st, 1859, each for five hundred (500) dollars, with interest at seven per cent. per annum, payable semi-annually on the 1st of April and 1st of October — say total amount of said bonds fifteen thousand (15,000) dollars, which said bonds I promise to return to said Hazard or his assigns in six months from this date, and pay him or them or his assigns the interest which in the mean time shall become due upon said bonds, and on the days it becomes due, the

said Hazard or his assigns on my returning the same (and paying the interest) as aforesaid, to refund to me the securities I have placed in his hands for the loan of the same, viz., Seymour, Moore & Co.'s draft at six months from August 14, 1856, accepted by Thomas Dugan, Treasurer, payable at Metropolitan Bank in the city of New York, for ten thousand (10,000) dollars, indorsed by Samuel Hallett and John Thompson (it being agreed that this draft may be exchanged for equal value of same paper payable in six months from its maturity), also my two notes at six months from this date indorsed by F. M. McDowell and John Thompson for the sums of three thousand and two thousand dollars, or the amount thereof in money.

(Signed)        SAMUEL HALLETT.

On the 26th day of June, 1857, Hazard, at New York, at Hallett & Co.'s office, demanded of Hallett's agent and partner, McDowell, return of the bonds, and tendered back the securities. August 20, notice was served on Hallett in the same manner that the notes pledged would be sold by A. B. Dike at public auction at Providence, August 28. Thompson saw this notice at Hallett's office. The sale was adjourned to September 7, and the notes and acceptance then sold to the plaintiff. The notes and acceptance pledged fell due before the notice to sell was given. The sale was advertised in the Providence Journal ten days, describing the notes and acceptance.

*E. R. Potter* ( *W. H. Potter* with him), *pro se ipso* plaintiff. The plaintiff had a right to sell, by the terms of the pledge, and had a right to sell even independent of the agreement. As to the general right to sell a pledge at public auction after default and notice, until the case of *Wheeler* v. *Newbould*, 16 N. Y. 392, the right so to sell a pledged note was never doubted. Kent Com. vol. 2, p. 582; vol. 4, p. 139; Story on Bailments, and Smith's Lead. Cas. up to *Wheeler* v. *Newbould*, treated the right to sell as applying to all pledges without distinction. In all the cases up to *Wheeler* v. *Newbould*, the right to sell at public auction was never disputed. There are cases of notes where the sale has been held illegal for want of notice, selling privately, or other reasons, but none where the right to sell at public auction was disputed. *Tucker* v. *Wilson*, 1 P. Wms. 261; *Pothonier* v.

Potter *v.* Thompson.

*Dawson*, Holt N. P. 385; *Cortelyou* v. *Lansing*, 2 Caines Cas. in Er. 200; *Hart* v. *Ten Eyck*, 2 Johns. Ch. 100; *Evans* v. *Darlington*, 5 Blackf. 320; *Bowman* v. *Wood*, 15 Mass. 534; *Garlick* v. *James*, 12 Johns. 146. ·

The cases where notes have been pledged have always turned upon some other question. *Thayer* v. *Putnam*, 12 Met. 297, was a question of compromising a note for less than pledgor agreed to. In *Washington Bank* v. *Lewis*, 22 Pick. 24, a bank director took a note to get discounted, and pledged it for his own debt. The question was between the maker and the bank. The case of *Powell's administrator* v. *Henry*, 27 Ala. 612, involved a question of diligence, where the pledgee, instead of selling, had undertaken to collect a note. The decision in *Wheeler* v. *Newbould*, 16 N. Y. 392, must be considered rather as changing the law than declaring it. It is a change which if necessary should have been made by the legislature, who might have provided for its taking effect on a certain day and after full knowledge. It would not be attended with the evil retroactive effects of a judicial change of the law.

The contract in this case did not contemplate a return of the identical securities; it was evidently made on the law as formerly understood, implying a right to sell.

As to T. being accommodation indorser. He could have no right as such against Hazard, nor is it in evidence that he ever claimed any rights as such. See Story on Promissory Notes, §§ 190–4, as to notes taken before due; as to notes taken after due, see *Thomson* v. *Shepperd*, 12 Met. 311; *Eaton* v. *Carey*, 10 Pick. 211. Hazard would not probably have made the loan without T.'s indorsement. And from the apparent connection between Thompson and Hallett, Hazard would have a right to suppose Thompson had an interest in it.

As to a tender and refusal making a conversion. To make a conversion, it should not be a mere offer but a legal tender, and nothing short of it. To make a tender, the person must have the money, and it is not sufficient that there is a person present who is willing to loan it to him. *Sargent* v. *Graham*, 5 N. H. 440. He must produce it unless the production is prevented or waived. *Sands* v. *Lyon*, 18 Conn. 18. In the case of a note payable in Arkansas currency, it was held that in case of a note payable in specific articles, it must be met at the

Potter *v.* Thompson.

day, and that a tender afterwards was not good unless the damages were matter of computation, and could be ascertained without a jury. *Day* v. *Lafferty*, 4 Pike, 450. He must keep the money or article so that the other party can take it, and the tender is of no avail otherwise. *Slocum* v. *Petrie*, 16 Ill. 267. He must bring it into court. *De Wolf et al.* v. *Long*, 2 Gilman, 679. A tender and refusal revests the pledge. *Ratcliff* v. *Davis*, Cro. Jac. 244, and Yelv. 178. But a refusal effects no conversion where the authority is questioned. *Ingalls* v. *Bulkley*, 15 Ill. 224. A conversion must be some act inconsistent with and in defiance of the rights of the true owner. Here there was no tender either of bonds or money. H. never did refuse money for the notes, nor would have done so. He was acting under advice of counsel to keep himself safe.

As to place of sale, no hardship in place of sale, although neither party resided in Providence. The contract was made in Rhode Island and to be performed there. T. lived in Rhode Island, and his name was on all the paper. T., as a business man, would be known in Providence, — Providence the only place where there is a broker's sale — resorted to from the whole state.

*Currey*, for the defendant, contended that the plaintiff acquired no title to the paper declared on and could maintain no suit upon it. I. Because the law of pledge does not authorize the pledgee of commercial paper to sell it at public auction, without a special contract for that purpose, citing *Garlick* v. *James*, 12 Johns. 146 ; *Stearns* v. *Marsh*, 4 Denio, 227 ; *Wheeler* v. *Newbould* 16 N. Y. 398 ; *Cortelyou* v. *Lansing*, 2 Caines Cas. in Er. 213. There was a special aggravation of the injustice and consequent illegality in this transaction, in selecting Providence as the place of sale, where none of the parties to the paper resided or were known, or could have had any credit, whether solvent or not. *Dyckers* v. *Allen*, 7 Hill, 497. II. Because it was sold without personal notice to the pawner, Hallett, and without the sanction of judicial proceedings. III. Because it was sold after the defendant had offered to redeem.

DURFEE, J.[1] This is an action against the defendant as indor-

---

[1] This case was heard by BRADLEY, C. J., and BRAYTON and DURFEE, JJ., before Judge Potter was elected a Judge of the Supreme Court.

ser on two notes and an acceptance. The notes, which bear date December 26, 1856, were made by one Samuel Hallett, payable to the order of F. M. McDowell six months after date, the one being for $3,000, and the other for $2,000, and are indorsed by the said McDowell and the defendant. The acceptance bears date August 14, 1856, is for $10,000, drawn on Thomas Dugan, &c., by Seymour, Moore & Co., payable to the order of the drawers in six months, accepted by Dugan and indorsed December 26, 1856, by the drawers, Samuel Hallett and the defendant. On the 26th of December, 1856, the said notes and acceptance came into the possession of Rowland G. Hazard, as security for the return of certain railroad bonds of the par value of $15,000, then loaned to Samuel Hallett, and which, by the terms of the loan, were to be returned in six months. On the day on which the bonds were returnable, Mr. Hazard demanded them of Hallett's agent, tendering the securities in exchange for them, but the bonds were not returned.

The defendant, however, testifies that he subsequently made Mr. Hazard several offers at different times about paying him the value of the bonds, or to return the same class of bonds, or to pay him their value at the time the loan matured. But there is no testimony that the defendant had either the bonds or the money to pay for their value, with him at the time of making these offers. Mr. Hazard testifies that he and the defendant had some negotiations about the time the bonds became returnable, in all of which the defendant merely offered him his notes, and that afterwards he offered to return the bonds. The defendant also offered by letter to return the bonds, and to pay the amount of their depreciation in market value. The defendant testifies that he had at that time $10,000 of the bonds, and knew where he could get the rest. He does not testify whether or not he had the money to pay the depreciation. The defendant's offers were declined, Mr. Hazard being unwilling, and refusing to give up the collateral to the defendant, except upon payment in full.

Subsequently to these offers, after notice to Hallett had been left with his agent in New York, Hallett himself being absent in Europe, and after ten days' advertisement of the sale in the Providence Journal, Mr. Hazard sold the said acceptance and notes at Providence, at public auction, on the 7th of September,

1857, to the plaintiff, who purchased the same with notice that Mr. Hazard held them in pledge as security for the return of the bonds aforesaid. The paper was sold for $4,500, the face of the paper being $15,000. No question is made but that the acceptance and notes were presented for payment at maturity, and that the indorsers were duly notified of the non-payment thereof.

The defendant contends that the plaintiff acquired no title to the paper so purchased by him, and can maintain no suit upon it, upon the ground that the law of pledge does not authorize the pledgee of commercial paper to sell it at public auction, without a special contract for that purpose.

In support of this position, the defendant relies very much upon the decision of the case of *Wheeler* v. *Newbould*, 16 N. Y. 392, made by the Court of Appeals of the State of New York, affirming the decision of the Superior Court of the city of New York (5 Duer, 29). That was a case of a pledge of commercial paper to secure the payment of a loan, which was to be repaid a few months before the paper would mature. The paper, which consisted of fourteen notes, amounting to the sum of $2,614.73, and taken by the pledgors in the usual course of their business as merchants, was sold by the pledgee to reimburse himself, before maturity, for $2,020, and as it matured was paid in full. In an action by the pledgors against the pledgee, it was held that the plaintiffs were entitled to a verdict for the excess of the amount of the notes, above the amount of the loan and interest. The decision does not deny that a pledgee of goods and chattels ordinarily has authority, after default and upon notice, to sell the same at public auction for his reimbursement; but distinguishes between such property and commercial paper, on the ground that commercial paper would be more likely to be sacrificed by the sale, and that the proper inference from such a pledge is, that it was intended that the creditor, if he resorted to the pledge, should accept the money from the hypothecated securities, as it became due and payable. The court were of the opinion that neither party could have intended that the notes should be sold in satisfaction of the debt within so short a period of their maturity, and that to legalize such a transaction would be to sanction and encourage injustice and oppression.

The case is not precisely parallel with the case at bar, for in

the case at bar the paper had all matured long before the sale
— the draft for $10,000 before default, and the two notes at or
about the time of the default — and payment thereof had been
refused.    The pledgee, therefore, if he would resort to the paper,
must either sell it or have it sold by a court of equity, or sue
upon it.    It may be that in the absence of any express authority,
no authority should be implied to sell the paper before it ma-
tures ; but must we also hold, that no authority can be implied
to sell the paper after it matures if unpaid, thus obliging the
pledgee to involve himself in a lawsuit, and possibly in several
lawsuits, if he would be indemnified out of the paper ?  We think
not.    The general rule is, that the pledgee of personal property
has authority to sell in case the pledgor makes default, and the
rule should have no exceptions which are not based on good rea-
sons.    It may be a reasonable exception to the rule that the
pledgee of commercial paper soon to mature should not sell it
immediately upon the pledgor's default, but should wait for it to
mature and then present it for payment.    It is not improbable
that a court of equity, if asked to sanction the sale of such pa-
per, before it matured, for the benefit of the pledgee, would re-
fuse the request; but if the same request were made after the
paper had matured and payment thereof had been refused, we
are inclined to think the request would be deemed reasonable and
would be granted.    We see no good reason for requiring that
the pledgee should be at the expense of a suit in equity to au-
thorize a sale, if a sale is to be had, except it be for the protec-
tion of the pledgor, and the pledgor, if duly notified, can protect
himself, provided the sale is made in a proper place and at pub-
lic auction.

If it had been the intention of the pledgor that the pledged
paper should not be sold in any event, its commercial character
could have been easily destroyed by a special indorsement.  In-
deed, it may be remarked that the two notes in suit appear to
have been made expressly with a view to their hypothecation,
and we can think of no good reason why that portion of the
security should have been given in that form rather than by
direct guaranty, except the reason that, given in that form, it
could be sold and transferred to the purchaser.    The same may
be remarked of the defendant's indorsement of the acceptance.

The defendant contends that the sale was invalid for want of personal notice to the pledgor. The notice was given, not to the pledgor personally, but to F. M. McDowell, at the office of Samuel Hallett & Co., as his agent, ten days before the sale. Samuel Hallett, the pledgor, was in Europe, and Rowland G. Hazard, the pledgee, makes affidavit that Hallett stated to him that he was going to Europe, but should leave all his business in charge of Mr. F. M. McDowell, his partner, and that to his knowledge the said McDowell did act as the said Hallett's attorney during his absence. A copy of the power of attorney to McDowell shows that he was constituted an agent or attorney for Hallett, to have charge of all said Hallett's business of every name and nature, and to do and perform, in and about his business, and in and about all other matters and transactions, all acts and things, as fully and with the same effect as Hallett himself could do. We think the notice, given during the absence of the principal to an agent having such unlimited powers, is to be deemed as of the same effect as if given to the principal.

The defendant also objects that the sale, if to be made at all, should have been made in New York rather than in Providence, and for that reason is invalid. We do not think we can sustain this objection. The contract of hypothecation purports to be a Rhode Island contract, and in Rhode Island there was no better place for such a sale than Providence. There is no evidence to show that either McDowell, the agent of Hallett, or the defendant, though he saw the notice of the sale, objected previous to the sale to the proposed place of sale. Inasmuch as they then had an opportunity to object, if the place was improper, the objection should then have been made.

The defendant further contends that the sale was invalid because it was made after he had offered to redeem. There might be some ground for this claim if the defendant had ever tendered the money to pay for the bonds, at their market value, on the day fixed for their return, or had tendered the bonds themselves and the money to pay for their depreciation. His counsel contends that the previous refusal made the tender unnecessary. But for this he cites no authority, and we find none. On the contrary, unless the party making the verbal offer has the money or thing offered with him, or within his control at the time, and is pre-

vented from producing it by the refusal to accept, the offer is ineffectual. *Sargent* v. *Graham*, 5 N. H. 440; *Dunham* v. *Jackson*, 5 Wend. 22; *Breed* v *Hurd*, 6 Pick. 356. We know of no case in which an offer by letter, the parties being miles apart, has been considered as of any effect. Great importance, it is said, is attached to the production of the money, as the sight of it might tempt the creditor to yield and accept it. 2 Greenl. Ev. § 602. In this case it does not appear even that the defendant had the money offered or more than two thirds of the bonds. We think it would be going too far to hold the defendant's letter to Mr. Hazard or his conversations with him equivalent to a tender, because the proposals made in them did not receive Mr. Hazard's assent.

Another point suggested by the defendant is, that the plaintiff, having purchased the paper after maturity, holds it subject to equities and can recover of the defendant, who is an accommodation indorser, only what the pledgee could himself have recovered. We think this view cannot be sustained. The pledgee, when he sells for the default of the pledgor, sells not his own interest (or at any rate not merely his own interest), but all the right or interest which the pledgor could empower him to sell at the time the pledge was given.

We give judgment for the plaintiff, for the amount which is expressed to be due on the face of the paper, with interest.

*Judgment for plaintiff.*